ORIGINAL

# SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN 3 0 2009

CLERK, U.S. DISTRICT COURT
By _____
Deputy

28483

| | |
|---|---|
| MICHAEL A. REHFELDT *ex rel.* ) | |
| UNITED STATES OF AMERICA and ) | |
| THE STATE OF TEXAS ) | |
| ) | |
| Plaintiff, ) | **3-0 9 C V 0 2 0 3 - B** |
| ) | Case No: _____ |
| v. ) | |
| ) | |
| VITAS HEALTHCARE ) | |
| CORPORATION, VITAS ) | |
| INNOVATIVE HOSPICE CARE OF ) | |
| SAN ANTONIO, LP, WELLMED ) | **FILED UNDER SEAL** |
| MEDICAL MANAGEMENT, ) | **DO NOT PLACE IN PRESS BOX** |
| CARE LEVEL MANAGEMENT, LLC, ) | **DO NOT ENTER ON PACER** |
| INSPIRIS, INC., INSPIRIS ) | |
| HOSPICE , LLC, JUSTO CISNEROS ) | **DEMAND FOR JURY** |
| and KEITH BECKER ) | |
| ) | |
| Defendants. ) | |

## *QUI TAM* COMPLAINT

Plaintiff-Relator Michael A. Rehfeldt, on behalf of himself, the United

States of America, and the State of Texas, alleges and claims against VITAS

Healthcare Corporation d/b/a VITAS Innovative Hospice Care, VITAS Innovative

Hospice Care of San Antonio, LP, WellMed Medical Management Group, Care

Level Management, LLC, INSPIRIS, Inc., INSPIRIS Hospice, LLC, Justo Cisneros, and Keith Becker (collectively "Defendants") as follows:

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Jurisdiction is also authorized over both the federal and state law claims under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Texas, transact substantial business in the State of Texas, transact substantial business in this judicial District, and can be found there.

## PARTIES

3.     Defendant VITAS Healthcare Corporation (VITAS) is a Florida-based operator of the largest hospice provider organization in the United States.  Founded as a volunteer organization in 1978 by a United Methodist Church minister and an oncology nurse, VITAS is now a massive profit-driven company.  In 2004, Roto-Rooter, Inc. – now Chemed Corporation (CME-NYSE) – then a part owner, purchased the remaining 63% of VITAS for approximately $410 million.  VITAS is a Medicare-certified hospice provider that currently serves over 11,000 patients.  VITAS provided 4,189,169 days of hospice care in 2007 and recently reported

2

2008 third-quarter revenues of approximately $200 million.  VITAS conducts its operations through a number of special purpose vehicles such as Defendant VITAS Healthcare of San Antonio, LP.

4.      Defendant WellMed Medical Management Group (WellMed) is a health management organization (HMO) based in San Antonio, Texas, currently serving over 70,000 patients.  WellMed is a Medicare HMO which contracts with the United States Department of Health and Human Services Center for Medicare & Medicaid Services (CMS) to provide all Medicare-approved treatment to Medicare-eligible enrollees in exchange for a per-patient monthly payment.

5.      Defendant Care Level Management, LLC (CLM) is a Medicare HMO and provider of care management services with offices in Arizona, Texas, Florida, New York, and Pennsylvania. Like WellMed, CLM receives monthly per-patient payments from the United States (through CMS) in return for its commitment to provide all Medicare-covered care to such patients.  CLM is wholly owned and operated by Defendant INSPIRIS, Inc., (INSPIRIS) a Tennessee corporation whose sole business is the operation of CLM and INSPIRIS Hospice, LLC, (INSPIRIS Hospice) a hospice care provider with locations in Texas, Arizona and Pennsylvania.

6.      Defendant Justo Cisneros (Cisneros) is a medical doctor who from approximately 1995 to 2008 served as the Medical Director for VITAS' San

Antonio operation.   At the same time as he held that position, he also became employed as a medical director and physician for CLM and as a physician and consultant for WellMed, both large referral sources for VITAS.   Upon information and belief, Cisneros is now employed by INSPIRIS, CLM, INSPIRIS Hospice, or all three.

7.     Defendant Keith Becker (Becker) was a long-time VITAS employee and executive who in or around 1995 became General Manager of the VITAS San Antonio office.   In 2007, Becker became Vice President of Operations for the State of Texas, assuming responsibility for Houston, Fort Worth, Dallas, and San Antonio.   Upon information and belief, Becker is now employed by INSPIRIS.

8.     Plaintiff-Relator Michael Rehfeldt (Rehfeldt or Plaintiff-Relator) is a long-time employee and administrator of non-profit hospices.   In 2008, he was hired by VITAS and became general manager of its San Antonio operation. Through in-depth evaluation of patient records and statistics, as well as through conversations and interviews with VITAS' employees and officers, Plaintiff-Relator has discovered an interwoven network of schemes designed to fraudulently bill Medicare for non-qualifying patients and to fraudulently shift costs from the Defendants to the United States.   Rehfeldt discovered that Becker and Cisneros orchestrated a scheme to admit and re-certify patients who were not terminally ill and did not qualify for the Medicare hospice benefit.   Becker fostered and then

4

utilized Cisneros' connections with the Medicare HMOs to generate fraudulent referrals, accepting non-qualifying patients in order to boost VITAS' rolls and to mollify WellMed and CLM (hereinafter the "HMO Defendants"). The scheme allows the HMO Defendants to dump non-profitable patients onto hospice, regardless of their qualifications. Additionally, Plaintiff-Relator has discovered a systematic practice at VITAS of fraudulently eliciting and backdating patient revocations in order to avoid bearing the expense of costly procedures, fraudulently shifting such costs onto Medicare. Plaintiff-Relator has discussed his suspicions with Ian Viente, VPO and Peggy Pettit, EVP/COO, and other VITAS executives, and has concluded that VITAS' false certifications, fraudulent billing, and cost shifting to the United States constitute a widespread, systematic practice endemic to VITAS. It is the goal of VITAS' corporate governance to hide the evidence of the scheme through both active concealment and assumed willful ignorance. Plaintiff-Relator is informed, and believes, that Becker and Cisneros are now implementing the same schemes in their new employment with INSPIRIS, which owns CLM and INSPIRIS Hopsice. Defendants' fraudulent practices offend Mr. Rehfeldt's long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and induce him to file this Complaint on behalf of himself, the United States, and the State of Texas as an original-source relator under *the qui tam* provisions of the False Claims Act and Texas Human Resources

Code §§ 36.001-36.117 (the Texas Medicaid Fraud Prevention Act).   Plaintiff-Relator is concurrently serving on the Government a written disclosure of the material evidence and information upon which this claim is based.

## THE MEDICARE HOSPICE BENEFIT IN GENERAL

9.     Defendants' aggressive, profit-maximizing business models represent an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.  The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the dying.  In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminally ill patients.  Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home."   In 1982, Congress created a provisional Medicare Hospice Benefit ("Hospice"), made permanent in 1986.  By 1990, 800 Hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

6

10.    From such humble altruistic roots, Hospice has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In 2006, payments to Texas hospices alone amounted to nearly $700 million. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the Hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that Hospice represents a potentially unlimited stream of income for those who position themselves correctly and have brought aggressive marketing, sales, and growth tactics into the new industry of care for the dying. On January 9, 2009 the Medicare Payment Advisory Commission issued a statement and set of recommendations addressing Medicare's ballooning liabilities under Hospice. The Commission noted that for-profit hospices now dominate the market and that such hospices have a length of stay around 45% greater than non-profits. The Commission concluded that the Hospice system "embodies incentives that may undermine" Medicare's goals.

11.    Leslie Novak, then Acting Director of CMS, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home." Nevertheless, Defendants and other for-profit Hospice companies have instituted a fraudulent scheme to treat the

Medicare Hospice Benefit as an improper subsidy for general care to elderly and chronically-ill patients and to illegally and fraudulently shift costs to boost their own profits while increasing the burden on the Medicare system. One manner in which this is being accomplished is through collusion between hospices and Medicare HMOs. The authors of the 1997 article "The Medicare-HMO Revolving Door – The Healthy Go In and the Sick Go Out"[1] recognized the potential for abuse among Medicare HMOs, who stand to greatly benefit from keeping healthy patients on their rolls and sick ones off. As described herein, that potential is being realized, in that the HMO Defendants are using their position as primary referral sources for hospices to fraudulently dump their sick – but not terminal – patients into the Hospice system.

12. Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. Qualified

---

[1] *Robert O. Morgan, Ph.D., Beth A. Virnig, Ph.D., M.P.H., Carolee A. DeVito, Ph.D., M.P.H., and Nancy A. Persily, M.P.H.*, NEW ENGLAND JOURNAL OF MEDICINE, July 17, 1997, at 169.

beneficiaries who elect Hospice agree to forego curative treatment for their terminal condition.

13.     Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses Hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. Medicare and/or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule that has four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), inpatient respite care (IRC), and general inpatient care (GIC).

14.     The four categories are distinguished by the location and intensity of the services provided and the base payments for each category reflect variation in expected input cost differences. Specifically, patients who are eligible for IRC and GIC Hospice care qualify not only for Medicare reimbursement of inpatient Hospice services, but also for federally-funded reimbursement room and board costs at nursing homes and certain other in-patient facilities. In such instances, the patient may receive goods and services from the Hospice provider that offset the costs to the nursing home of otherwise duplicative goods and services. If a patient does not qualify for IRC or GIC Hospice care but only qualifies for RHC or CHC,

9

then she may nevertheless receive Hospice care while in a nursing home. However, the nursing home will not receive Medicare reimbursement for nursing home care. In any event, in order for a patient to receive Hospice care in a nursing home, the nursing home must have a contract with a Medicare-certified Hospice provider.

15.     Unless a Hospice company provides CHC, IRC, or GIC on any given day it is paid at the RHC rate. For any given patient, the type of care can vary throughout the Hospice stay as the patient's needs change. The daily payment rates are intended to cover costs that Hospice providers incur in furnishing services identified in patients' care plans for patients who have been determined by their physicians to be suffering a terminal illness.

### THE DEFENDANTS' FRAUDULENT SCHEMES FOR PRESENTING FALSE CLAIMS AND FRAUDULENTLY SHIFTING COSTS ONTO THE UNITED STATES

**(a)     Defendants' Fraudulent Certification and Re-Certification of Non-Terminal Patients for Hospice.**

16.     Defendants have defrauded the United States through a systematic pattern and practice of referring and enrolling non-terminal patients for Hospice. In particular, the Defendants conspired for the HMO Defendants to fraudulently refer, and the Hospice Defendants to fraudulently enroll, high-cost chronically-ill – but not terminally-ill – patients, and to fraudulently bill Medicare and/or Medicaid for Hospice services to such patients who do not qualify for Hospice benefits.

17. Through Becker and Cisneros, and with the approval of upper-management, VITAS executed a premeditated systematic multi-year plan to admit patients that were clearly not eligible for the hospice benefit. Admissions were frequently maintained over multiple objections by team physicians and staff. Additionally, admitting diagnoses were fraudulently changed in an attempt to avoid detection of the fraud. Cisneros signed, wholesale, hundreds or perhaps thousands of certifications without examining patients or even reviewing their charts. In fact, for some of the time he served as Medical Director of VITAS, Cisneros did not even have an office there. Plaintiff-Relator has been repeatedly told by team physicians that their recommendations to discharge ineligible patients have been ignored and that they have instead been instructed to recertify such patients. If they failed to comply, patients were frequently and repeatedly recertified by Cisneros, without examination or review.

18. A December 12, 2008 email documents the representative case of a patient fraudulently admitted and re-certified under Defendants' scheme. Lisa Corona, manager of a VITAS in-patient unit, reported to Plaintiff-Relator that a man had entered her facility that day on his own power, walking with a cane. His chart showed that he had been receiving hospice benefits on VITAS' rolls for over two years, having been admitted under a terminal diagnosis of "End Stage Stroke." The guidelines for that diagnosis essentially require that the patient be non-

11

ambulatory and non-verbal, which was completely at odds with the observations of VITAS' staff and medical personnel. Coruna reported that the team physician had never believed that the patient was eligible for the hospice benefit and had recommended that he be discharged. The patient had instead been repeatedly recertified.

19.     The above example is a typical result of Defendants' fraudulent practices. When Plaintiff-Relator became GM of the San Antonio office in 2008, he found that, of the 560 patients on VITAS' rolls in San Antonio, 21.6% had a length of stay over 500 days, many of which were stable, non-terminal, and never qualified for hospice care. VITAS' upper-management was aware of the situation and refused to take appropriate action. Senior Vice President of Operations Ian Viente (Viente) informed Plaintiff-Relator that the company knew that San Antonio's patient rolls were "founded on a false premise." When Viente questioned Chief Operating Officer Peggy Pettit regarding his suspicions of fraudulent certifications in or around 2007, he was told: "Don't ask, it is going well out there [in San Antonio]."

20.     On January 26, 2009, Gail Johnston, RN, National Patient Care Administrator, told Plaintiff-Relator, that in early 2008 she had been tasked by VITAS with reviewing the charts of San Antonio patients whose length of stay exceeded 1,000 days. Johnson reported to VITAS COO Peggy Pettit that her

12

review revealed patients that were not eligible for Hospice and needed to be discharged.   Pettit never responded and the patients were not discharged until Plaintiff-Relator became GM and initiated discharges in November and December 2008.

21.   The   numerical   evidence   unequivocally   demonstrates   the pervasiveness of VITAS' fraudulent practices and belies ignorance on the part of the corporate governance; indeed, the efforts of VITAS' leadership have been solely directed at avoiding detection.   VITAS keeps track of nearly every conceivable patient statistic via its proprietary software "VX".   VITAS management had the ability at any time to examine, for example, the number of patients in San Antonio whose length of stay exceeded 500 days (21.6%, as of 2008).   Nevertheless, these patients were not discharged, even upon review and despite the recommendations of staff.   In 2007, the San Antonio office began undergoing a Focused Medical Review by CMS.   VX reveals the number of living patients discharged from the San Antonio office rolls from 2003 to 2008:

| | |
|------|----|
| 2003 | 20 |
| 2004 | 24 |
| 2005 | 28 |
| 2006 | 36 |

| 2007* | 147 |
| --- | --- |
| 2008 | 148 |

*Focused Medical Review begins

The data bears almost no construction other than that hundreds of ineligible patients on the San Antonio rolls, for which VITAS was content to fraudulently bill Medicare, were purged once the fraud threatened to be discovered.

22.    VITAS' concealment attempts continue.   On October 28, 2008, Plaintiff-Relator attended a Senior Leadership meeting at which the issues in San Antonio – the ineligible patients on the rolls and the practices of Cisneros and Becker – were to be discussed.  Prior to that meeting, he was told by Viente to keep no written records of the discussions.  The next month, November, 2008, VITAS National Medical Directors conducted a review of patient charts in San Antonio showing lengths of stay over one year.  At that time, National Medical Director Dr. Policzer told Plaintiff-Relator that many of the patients reviewed were never eligible and that he did not know why they were ever admitted.  During a

subsequent management team conference call on November 14, 2008, however, this position was reversed, and the official position taken by VITAS was that the patients had all been admitted properly.

23.     Defendants know that their above-described practices directly result in admission of non-qualifying patients and re-certification of patients for Hospice care whose condition is stable.   Upon information and belief, a significant percentage of all of the Hospice Defendants' claims for payment to the United States through Medicare and Medicaid are for patients who do not have a genuine diagnosis of a terminal illness, who do not qualify for Hospice, and whose lengths of stay belie a reasonable terminal diagnosis.

**(b)     The Conspiracy to Fraudulently "Dump" Chronically-Ill Non-Terminal Patients into Hospice**

24.     VITAS' scheme of admitting non-qualifying patients for hospice care was frequently furthered through and in collusion with the HMO Defendants.  By admitting non-qualifying patients referred by the HMO Defendants – through Cisneros or other dual employees – VITAS, and upon information and belief INSPIRIS Hospice, boost their own rolls and Medicare reimbursements. Additionally, they endear themselves to the HMO Defendants, who are able to fraudulently transfer their high-cost, unprofitable patients to Hospice.

25.     The HMO Defendants operate under agreements with the United States, through CMS, whereby the HMO Defendants receive monthly per-patient

15

payments for every Medicare-eligible enrollee. In exchange, the HMO Defendants agree to provide such patients with all required Medicare-approved care. Within this system, the profitability of the HMO Defendants is directly tied to the proportion of healthy patients on their rolls. Patients requiring no care represent pure profit to the HMO Defendants. Chronically ill patients, on the other hand, represent a liability to the HMO Defendants, severely cutting into their profit margins.

26.     As a means of cutting costs and boosting profits, the HMO Defendants have devised a scheme of dumping these chronically ill – though not terminally-ill – patients into Hospice, by fraudulently referring them to the Hospice Defendants. The HMO Defendants thereby purge themselves of expensive patients and boost their percentage of healthy patients, while providing the Hospice Defendants with the benefit of additional referrals. The United States, on the other hand, is deprived of the benefit of its bargain with the HMO Defendants and is defrauded into paying a Hospice per-diem rate for non-qualifying care that it has already funded at the – much lower – HMO monthly rate. Defendants executed the scheme by placing Cisneros in key positions at both the HMO Defendants and the Hospice Defendants and paying him a share of the ill-gotten profits of both.

27.     Defendants' conspiracy to fraudulently bill the United States and illegally shift costs within the Medicare umbrella was effected mainly though

Cisneros, who purported to maintain full-time employment simultaneously with the HMO Defendants and VITAS – and later, CLM and INSPIRIS Hospice. Plaintiff-Relator has received emails from Cisneros regarding VITAS business, sent from Cisneros' CLM email account. Cisneros was thus in a position to refer or arrange for the referral of non-qualifying patients to VITAS – and now, upon information and belief, INSPIRIS – *and* to fraudulently certify them for hospice treatment. Cisneros received compensation from the Hospice Defendants in direct proportion to the number of patients on the rolls of the Hospice Defendants, which he boosted by fraudulently referring from the HMO Defendants. Upon information and belief, Cisneros also received compensation from the HMO Defendants in proportion to per-patient profitability, which he boosted by shifting high-cost, non-terminal patients to the Hospice Defendants.

28. VITAS' collusion with the HMO Defendants was premeditated and orchestrated by Becker, with at least the tacit approval of VITAS' corporate leadership. Plaintiff-Relator was told by Becker that Becker arranged Cisneros' dual employment because it was "good for business." In August, 2004, Becker produced for corporate management an Operating Report on San Antonio, in which he identified CLM as a potential large source of referrals and outlined the fraudulent *quid pro quo*: "As much of a benefit as CLM is to Vitas, Vitas is an asset to CLM by helping keep the patients managed at home [on Hospice]."

17

Having thus declared his intention, Becker then arranged for Cisneros' dual employment at the two organizations.   VITAS' Regional Director of Market Development Donna Oviedo admitted to Plaintiff-Relator that non-terminal patients were falsely certified by VITAS to "keep CLM happy."

29.    Cisneros and Becker continued these activities in their employment with WellMed, CLM, and INSPIRIS.   During his employment with WellMed, Cisneros gave a number of presentations detailing the benefit the Hospice Defendants could provide WellMed.  A presentation was given entitled "The Best Year Ever" in which the speaker expounded upon the extent to which the relationship between WellMed and VITAS – through Cisneros – had benefited WellMed's bottom line.  Similarly, CLM, who upon information and belief now employs both Cisneros and Becker, boasts in its promotional materials that its "system" cuts costs and boosts revenue by dramatically increasing hospice referrals – 356% from typical HMO plans – and lengths of stay.   Led by Becker and Cisneros, these organizations unabashedly and fraudulently use Hospice as a means of cutting costs and increasing profitability.

    **(c)**    **The Fraudulent Scheme of Eliciting and Back-dating Fraudulent Revocations for Legitimate Hospice Patients who Require Hospitalization for Palliative Care**

30.    Similarly, VITAS has for many years fraudulently increased its profit margin through a long-standing pattern and practice – upon information and belief

now emulated by INSPIRIS – of fraudulently revoking legitimate Hospice patients who require expensive palliative hospital care. Hospice requires that the Hospice Defendants bear any costs for palliative care that exceed the standard per-diem amount. The per-diem rate paid by the United States to the Hospice Defendants, however, is generally much less than the actual per-diem cost of even a routine hospital stay for palliative treatment. As of 2008, VITAS typically receives $579 per diem from CMS for a patient's palliative hospital treatment, while its contract for hospital services calls for VITAS to pay a base level of $500 per day plus 50% of prescription medications and certain treatments and procedures. In some instances the additional cost of prescription medicine alone can reach up to $7,000 per day that a Hospice patient remains hospitalized. Unwilling to absorb such high costs of hospital care, VITAS fraudulently shifts these costs to the United States through false revocations. In order to boost its profit margin, VITAS fraudulently causes patients to revoke Hospice care for the duration of the patient's hospitalization in order to fraudulently shift these expensive costs to the United States.

31.   This practice of revoking legitimate Hospice patients for hospitalization is so pervasive that when Plaintiff-Relator took over as General Manager of VITAS's San Antonio office no VITAS staff member knew how or was even aware of a procedure for admitting a Hospice patient to the hospital for

palliative treatment to be paid by VITAS.  Rather, the standard practice was simply to have the patient sign a revocation form in order to be admitted to the hospital and then to re-admit the patient after the hospital stay, thus fraudulently shifting the extremely high cost of hospital care, treatment, and prescription medications away from VITAS and to the United States.  If VITAS failed to elicit a revocation from the patient prior to her hospital admission, then VITAS simply requested the patient to sign the revocation form after hospital admission and fraudulently back-dated the revocation in order to make it appear that the patient had revoked Hospice prior to hospitalization so that the hospital costs would be borne by the United States.   Defendants' practice in is direct violation Title 42, CODE OF FEDERAL REGULATIONS, 418.28.   As a result of the scheme, the United States pays a full Medicare fee-per-service rate for care that it has already paid for at the lower Hospice per-diem rate.   A cursory examination of patient charts reveals the following instances in which revocation papers have been signed, then back-dated to reflect a fraudulent effective date:

| PATIENT NO. | DATE SIGNED | EFFECTIVE DATE |
|-------------|-------------|----------------|
| 836294 | 12.12.2007 | 12.11.2007 |
| 795107 | 12.17.2007 | 12.12.2007 |
| 783981 | 02.23.2008 | 02.22.2008 |

| 787846 | 05.07.2008 | 05.03.2008 |
| 882874 | 07.28.2008 | 07.24.2008 |

32.    By and through all of the circumstances described *supra*, Defendants have undermined the noble intention and mission of Hospice, defrauded the United States, and jeopardized the already overly strained Medicare program.

## COUNT ONE
## FALSE CLAIMS FOR PAYMENT OF HOSPICE SERVICES TO NON-TERMINAL PATIENTS UNDER 31 U.S.C. § 3729

33.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

34.    Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States a false or fraudulent claim for payment or approval, to wit: Defendants knowingly referred or certified and/or re-certified Hospice patients whom they knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

35.    Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to

be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

36. By and through the actions described *supra*, Defendants knowingly made, used, or caused to be made or used, false certifications and re-certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid to get a false or fraudulent claim paid or approved by the United States.

37. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims for Hospice services to non-terminal patients.

WHEREFORE, Plaintiff-Relator requests entry of judgment in his favor on behalf of the United States, and against all Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

### COUNT TWO
### FRADULENT INDUCEMENT BY THE MEDICARE HMO DEFENDANTS FOR PAYMENT OF FALSE CLAIMS OR TO GET FALSE CLAIMS PAID UNDER 31 U.S.C. § 3729

38.   Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

39.   By and through the actions described herein, the HMO Defendants knowingly presented, or caused to be presented, to the United States false or fraudulent claims, to wit:   the HMO Defendants fraudulently induced the Government to pay monthly per-patient fees for patient care that they never intended to provide.

40.   The HMO Defendants agreed to provide care to patients in return for a monthly per-patient payment from the United States through Medicare.   The United States made it clear that such monthly payments were consideration for the HMO Defendant's agreement to provide ongoing patient care; and the HMO Defendants' agreement to provide such ongoing patient care was – in fact – a condition of the United States' monthly per-patient payments to the HMO Defendants.

41.   At the time that the HMO Defendants made and accepted the monthly per-patient payments, they intended to avoid the high costs of patient care for chronically-ill, non-terminally-ill patients by fraudulently referring such patients to VITAS and/or INSPIRIS for Hospice care.   To that end, the HMO Defendants employed Cisneros whom they knew to also be employed by VITAS and INSPIRIS and caused Cisneros to make or cause to be made such fraudulent

23

referrals and to fraudulently certify such patients for Hospice at VITAS and INSPIRIS.

42.    Accordingly, the United States was misled by the HMO Defendants' material misrepresentation that they would provide care for such patients that the HMO Defendants' ultimately avoided through fraudulent referrals to VITAS or INSPIRIS for Hospice care.

43.    By and through the actions described *supra*, the HMO Defendants knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent misrepresentations to the United States related to monthly per-patient claims for payment and false referrals to VITAS or INSPIRIS for Hospice care. Such false records or statements were used by the HMO Defendants to get false or fraudulent monthly per-patient claims paid or approved by the United States.

44.    The Medicare HMO's fraudulent actions described herein have resulted in damage to the United States equal to the monthly per-patient payments made to the Medicare HMO Defendants by the United States through Medicare for all non-terminal patients who were fraudulently referred to VITAS and/or INSPIRIS for Hospice care.

WHEREFORE, Plaintiff-Relator requests entry of judgment in his favor on behalf of the United States, and against the HMO Defendants in an amount equal

to treble the damages sustained by reason of HMO Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

**COUNT THREE**
**FRADULENT INDUCEMENT BY THE HOSPICE DEFENDANTS**
**FOR PAYMENT OF FALSE CLAIMS OR TO GET FALSE CLAIMS**
**PAID UNDER 31 U.S.C. § 3729**

45.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

46.    By and through the actions described herein, the Hospice Defendants knowingly presented, or caused to be presented, to the United States false or fraudulent claims, to wit:  the Hospice Defendants fraudulently induced the Government to pay per-patient per-diem fees for patient care that they never intended to provide.

47.    The Hospice Defendants agreed to provide care to patients in return for a per-patient per-diem payment from the United States through Medicare.  The United States made it clear that such per-patient per-diem payments were consideration for the Hospice Defendants' agreements to provide ongoing palliative patient care; and the Hospice Defendants' agreement to provide such

ongoing palliative care was – in fact – a condition of the United States' per-patient per-diem payments to the Hospice Defendants.

48.    At the time that the Hospice Defendants requested and accepted the per-patient per-diem payments, they intended to avoid the high costs of palliative-care procedures and medications by inducing patients to temporarily revoke their Hospice election in order that such expensive procedures should be billed under regular Medicare A, rather than by the Hospice.   To that end, the Hospice Defendants induced the patients to revoke their Hospice election and on many occasions fraudulently back-dated such revocations in order to shift the high costs of hospital procedures and prescription medications away from the Hospice Defendants.

49.    Accordingly, the United States was misled by the Hospice Defendants' material misrepresentation that they would provide such palliative care for such patients that the Hospice Defendants' ultimately avoided through fraudulent revocation and back-dating of revocations.  In many instances, after the expensive procedures were completed, the patients were fraudulently re-certified for Hospice.

50.    By and through the actions described *supra*, the Hospice Defendants knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent revocation documents and back-dated

revocation records and false claims for payment to the United States related to the per-patient per-diem claims for payment. Such false records or statements were used by the HMO Defendants to get false or fraudulent monthly per-patient claims paid or approved by the United States.

51.     The Hospice Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the monthly per-patient payments made to the Hospice Defendants by the United States through Medicare for all patients whose hospice election was fraudulently revoked.

WHEREFORE, Plaintiff-Relator requests entry of judgment in his favor on behalf of the United States, and against the Hospice Defendants in an amount equal to treble the damages sustained by reason of Hospice Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

### COUNT FOUR
### CAUSING TO BE PRESENTED FALSE CLAIMS FOR
### MEDICARE PAYMENT UNDER 31 U.S.C. § 3729

52.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

53.     Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for

payment or approval, to-wit: by fraudulently eliciting and backdating revocations in order to have costs paid on a fee-per-service basis by Medicare or Medicaid, the Hospice Defendants caused to be presented false claims to the United States in the form of the claims for payment for such service through Medicare or Medicaid, which should have been borne by the Hospice Defendants and not by the United States.

54.     Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent revocation of hospice patients in order to avoid paying for palliative treatment, which resulted in fraudulent billing of the United States at a much higher rate through Medicare or Medicaid.

55.     By and through the actions described *supra*, Defendants knowingly made, used, or caused to be made or used, false revocation documents and back-dated revocations regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid to get a false or fraudulent claim paid or approved by the United States.

56.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States through

Medicare and Medicaid for such false or fraudulent claims for payment of services which should have been paid for by the Hospice Defendants.

WHEREFORE, Plaintiff-Relator requests entry of judgment in his favor on behalf of the United States, and against the Hospice Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

### COUNT FIVE
### CONSPIRACY UNDER 31 U.S.C. § 3729(a)(2)

57.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

58.     Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, to-wit: Defendants knowingly certified and/or re-certified Hospice patients whom they knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

59.     The Government paid Defendants for such false claims.

60.     Defendants, in concert with their principals, agents, employees, and other institutions did agree to submit such false claims to the United States.

61.   Defendants and their principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

62.   Defendants' fraudulent actions, together with the fraudulent actions of their principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in its favor on behalf of the United States and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 21 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT SIX
## VIOLATION OF TEXAS MEDICAID FRAUD PREVENTION ACT
## TEXAS HUMAN RESOURCES CODE § 36.001-36.117

63.   Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

64.   By and through the conduct described, *supra*, Defendants knowingly made or caused to be made false statements or misrepresentations of material facts to permit persons to receive benefits or payments under the Medicaid program that

are not authorized or that are greater than the benefit or payments that are authorized.  The State of Texas reasonably relied on such false statements or misrepresentations and has been damaged in an amount equal to the payments made by the State of Texas to Defendants under the Medicaid program.

65.     By and through the conduct described, *supra*, Defendants knowingly concealed or failed to disclose information permitting persons to receive benefits or payments under the Medicaid program that are not authorized or that are greater than the benefits or payments that are authorized.  The State of Texas was misled by Defendants concealment or failure to disclose information and has been damaged in an amount equal to the payments made by the State of Texas to Defendants under the Medicaid program.

66.     By and through the conduct described, *supra*, Defendants knowingly applied for and received benefits or payments on behalf of other persons under the Medicaid program and converted part of the benefits or payments to uses other than for the benefits of the persons on whose behalf the payments were received. The State of Texas has been damaged in an amount equal to the payments made by the State of Texas under the Medicaid program that were converted by Defendants to uses other than for the benefits of the persons on whose behalf the payments were received.

67.     By and through the conduct described, *supra*, Defendants knowingly made, caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material facts concerning the conditions or operations of facilities in order that the facilities should qualify for certification or recertification required by the Medicaid program.   The State of Texas reasonably relied on such false statements or misrepresentations and has been damaged in an amount equal to the payments made by the State of Texas to Defendants under the Medicaid program.

68.     By and through the conduct described *supra*, Defendants knowingly paid, charged, solicited, accepted, or received, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of services or products or the continued provision of services or products where the cost of the services or products was paid for, in whole or in part, under the Medicaid program.   The State of Texas has been deprived of the honest services of Defendants and has been damaged in an amount equal to payments made by the State of Texas to Defendants under the Medicaid program.

69.     By and through the conduct described *supra*, Defendants knowingly entered into an agreement, combination, or conspiracy to defraud the State of Texas by obtaining or aiding others in obtaining unauthorized payments or

benefits from the Medicaid program. The State of Texas has been deprived of the honest services of Defendants and has been damaged in an amount equal to payments made by the State of Texas to Defendants under the Medicaid program.

70.     The HMO Defendants and the Hospice Defendants are managed care organizations that contract with the Texas Health and Human Services Commission or other Texas agencies to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program. The HMO Defendants and the Hospice Defendants knowingly failed to provide to individuals health care benefits or services that they are required to provide under such contracts with the Texas Health and Human Services Commission or other agencies. The State of Texas has been damaged by such failures in an amount equal to the actual cost of such health care benefits or services that Defendants failed to provide.

71.     By and through the conduct described *supra*, Defendants knowingly made, used, or caused the making or use of false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the State of Texas under the Medicaid program. The State of Texas reasonably relied on such false statements or misrepresentations and has been damaged in an amount equal to the to the actual cost of health care benefits or services that

Defendants failed to provide and that were instead paid for in part by the State under the Medicaid program.

WHEREFORE, Plaintiff-Relator demands judgment in its favor on behalf of the State of Texas and against Defendants, pursuant to 31 U.S.C. § 3732 and Texas Human Resources Code § 36.001-36.117, in an amount equal to two times the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of Defendants' fraud, including any payment made to a third party, together with civil penalties, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

Date:  January 29, 2009.

/s/ Henry I. Frohsin
HENRY I FROHSIN
JAMES F. BARGER, JR.
J. ELLIOTT WALTHALL

**OF COUNSEL**

FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:   205.933.4006

G. STEVEN HENRY

**OF COUNSEL**
G. Steven Henry, Attorney at Law
2229 1st Avenue North, Suite 222
Birmingham, Alabama 35203
Tel:  646.734.0878

Attorneys for Plaintiff-Relator
Michael A. Rehfeldt

**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

35

**JS 44** (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

ORIGINAL

SEALED
RECEIVED

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Michael A. Rehfeldt ex rel., United States of America and The State of Texas | VITAS HealthCare Corporation f/k/a Vitas Innovative Hospice Care of San Antonio, LP, et al |

**(b)** County of Residence of First Listed Plaintiff **Bexar, TX**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Henry I Frohsin, Frohsin & Bager LLC, One Highland Pl., 2151 Highland Ave., Ste. 310, Birmingham, AL 35205 (205)933-4006

Attorneys (If Known)

3-09CV0203-B

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 USC 3729-3733 False Claims Act

Brief description of cause:
Medicare Fraud

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Unspecified

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE 1/29/2009

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____